In the Matter of NIAGARA MOHAWK POWER CORPORATION, Appellant, v ELAINE CUTLER, as Chief Assessor of the Town of Day, et al., Respondents.

Third Department, July 18, 1985

**APPEARANCES OF COUNSEL**

*Lee, LeForestier, Malone & Hanft, P.C.* (*David R. Murphy* of counsel), for appellant.

*Roger L. Paul* for Robert Spence, respondent.

*John W. Sutton* for Melvin Hatley, respondent.

*Phil Sloan* and *Robert L. Beebe* for State Board of Equalization and Assessment, *amicus curiae*.

**OPINION OF THE COURT**

CASEY, J.

At issue on this appeal is the validity of the 1982 and 1983 real property tax assessments entered against petitioner as to certain "water rights" by the assessors in three Saratoga County towns containing lands submerged by waters impounded by the

Conklingville Dam on the Sacandaga River (Great Sacandaga Lake). We hold that those "water rights" were improperly included in the assessment rolls prepared by respondents and that petitioner's motion for summary judgment canceling the assessments should have been granted.

The Hudson River-Black River Regulating District (District) is a public corporation created to construct, maintain and operate reservoirs within its district for the purpose of regulating the flow of streams when required by the public welfare (ECL art 15, tit 21). The District's predecessor, the Hudson River Regulating District (HRRD), determined to construct a regulating reservoir on the Sacandaga River and to impound the waters by a dam at or near Conklingville, Saratoga County. For this purpose, HRRD purchased certain land from the New York Power and Light Corporation (NYPLC), petitioner's predecessor. In conveying this land, NYPLC reserved the right to use for its own purpose 15 feet of "head" on the Sacandaga River within the bounds of part of the property so conveyed. The term "head" refers to the difference between the height of the water behind the dam and that below the dam.

By an agreement dated November 14, 1927, NYPLC agreed to construct, maintain and operate, on its own land below the proposed Conklingville Dam, a power house capable of using not only its 15 feet of "head", but also the additional "head" to be developed by HRRD's dam, fixed at 56 feet. NYPLC also agreed to pay HRRD for furnishing the dam by which NYPLC's 15 feet of "head" would be developed and for the power produced by the power house from the use of HRRD's additional "head". HRRD agreed to maintain and operate the dam upon completion and to permit NYPLC to connect the necessary equipment to the outlet of the dam so that the water impounded by the dam could be taken directly into NYPLC's power house "when, as and if released by [HRRD] for the regulation of the flow of the river". Both parties complied with all terms of the agreement, as amended, which expired in 1980. Petitioner and the District entered into a successor agreement, dated June 17, 1980, having a term of 50 years, which provides for the continued operation of the dam and the power house.

In 1982 and again in 1983, pursuant to advice of the State Board of Equalization and Assessment (SBEA), assessors for towns containing lands submerged by the Great Sacandaga Lake, which was created by the waters impounded by the Conklingville Dam, included in their assessment rolls petitioner's "water rights" arising out of the transaction described

above. Petitioner filed protests, to no avail, and commenced the instant proceeding seeking declaratory relief and relief pursuant to Real Property Tax Law article 7. Special Term denied petitioner's motion for summary judgment, and this appeal ensued.

The right to use the "head" developed at the District's dam involves the right of a riparian owner to a reasonable use of the water flowing in a natural stream over his premises, which includes the right to temporarily detain it by a dam to furnish power (*Pierson v Speyer,* 178 NY 270, 272).[1] The riparian right is natural and inherent, and a part of the estate of each riparian owner (*Strobel v Kerr Salt Co.,* 164 NY 303, 320). "It is properly classified at common law, equally with the land itself, as real property" (*Matter of Van Etten v City of New York,* 226 NY 483, 486). "It is a valuable property right which can be severed from the riparian land by grant, condemnation, relinquishment or prescription" (*United Paper Bd. Co. v Iroquois Pulp & Paper Co.,* 226 NY 38, 46-47). When, as here, it is severed from the riparian land, it is an incorporeal hereditament (1 Rasch, NY Real Property Law and Practice § 683 [1962]).

Turning to the validity of the assessments at issue herein, our analysis begins with certain general principles. "The taxation of real property is authorized solely by statute" (*Matter of Crystal v City of Syracuse, Dept. of Assessment,* 47 AD2d 29, 30 [Simons, J.], *affd* 38 NY2d 883), and in determining whether property is subject to taxation, tax statutes are to be construed most strongly against the government and in favor of the citizen (*see, Matter of Grace v New York State Tax Commn.,* 37 NY2d 193, 196). Real Property Tax Law § 300 makes all real property within the State subject to real property taxation, unless exempt therefrom by law. But whether property is classified as real property at common law is not decisive of the question as to its status as taxable real property, for consideration must be given to the definition of real property contained in Real Property Tax Law § 102 (12) (*Matter of City of Lackawanna v State Bd. of Equalization & Assessment,* 16 NY2d 222, 226-227).

Based upon the foregoing principles, we conclude that the riparian right to use the "head" developed by a dam is not, in and of itself, taxable real property within the scope of Real Property Tax Law § 300. The definition in Real Property Tax

---

1. Also involved here, of course, is the State's power to construct, maintain and operate dams and reservoirs for flood control purposes and to protect public health, safety and welfare, but we do not believe this power affects or alters the parties' rights and interests at issue in this proceeding.

Law § 102 (12) contains no reference to riparian rights, water rights or hereditaments. In addition to numerous specific inclusions not relevant herein, the statute defines real property as "[l]and itself, above and under water, including trees and undergrowth thereon and mines, minerals, quarries and fossils in and under the same" (Real Property Tax Law § 102 [12] [a]). By way of contrast, the Real Property Law defines real property as "coextensive in meaning with lands, tenements and hereditaments" (Real Property Law § 2 [1]), and "the word hereditaments is more extensive in its signification than land or tenements", including within its scope incorporeal rights (*Nellis v Munson,* 108 NY 453, 458). It is also noteworthy that the definition of taxable real property in Real Property Tax Law § 102 (12) (b) specifically includes the right to wharfage which, like the riparian right involved herein, has been recognized as an incorporeal right (*Mayor of New York v Mabie,* 13 NY 151, 154).[2]

*Matter of City of New York v Schwartz* (36 AD2d 402, *lv denied* 29 NY2d 482), involving the taxation of certain riparian rights acquired by the City of New York for water supply purposes, is a case in point. This court concluded that, although riparian rights appurtenant to riparian land are includable in the assessment of such land as an enhancement to its value, riparian rights severed from the land to which they were appurtenant, which do not become appurtenant to other riparian land, are not real property within the meaning of Real Property Tax Law § 102 (12) and, therefore, not taxable pursuant to Real Property Tax Law § 300 (36 AD2d, at pp 403-404). When petitioner herein conveyed to the District the land where the dam was constructed, it retained the right to 15 feet of "head" developed on the Sacandaga River at the dam site, thereby severing that riparian right from the land to which it had been appurtenant. There is no claim that it became appurtenant to other riparian land owned by petitioner within the three towns involved in this proceeding and, therefore, our holding in *Matter of City of New York v Schwartz (supra)* is applicable. The right to any additional "head" developed on the river by the dam remained appurtenant to the land upon which the dam was constructed and was conveyed to the District. The right to use such additional "head" granted to petitioner in its subsequent agreements with the District is at most a severed riparian right subject to the same conclusion as the retained right. In fact, the right to such additional "head" appears to be nothing more than a

---

**2.** The extensive definition of "real property" in ECL 15-1703 (9) is also worthy of contrast with Real Property Tax Law § 102 (12) (a).

license (*see,* ECL 15-1705; *Eckerson v Crippen,* 110 NY 585, 591-592). Accordingly, petitioner's "water rights" are not taxable real property under Real Property Tax Law § 300.

In support of the challenged assessments, respondents and the SBEA refer to Real Property Tax Law § 566 and, in particular, the second sentence of that statute, which provides: "If the legal title to lands occupied or submerged by or in connection with a dam or reservoir for the storage of water for power purposes, or adapted for such purposes because of the existence of a dam site or otherwise, is held by the state or a person other than the owner of the dam, reservoir or dam site and appurtenant rights, but the use, occupation or possession of such lands, or the right to use, occupy and possess the same, is in such owner under an easement, right or lease for a term of fifty years or more or in perpetuity, then the interest of such owner shall be assessed as real property in the same manner as if such owner held legal title to such lands". It is argued that the purpose of this statute is to permit taxing jurisdictions containing lands submerged by water impounded by a dam to assess as real property the flowage rights of the power company which uses the water power produced by the dam, despite the fact that the power company is not the owner of the submerged lands (*see,* Memorandum of State Tax Commission, 1926, Governor's Bill Jacket, L 1926, ch 745). Petitioner, however, is not an "owner" whose interest in the flowage can be taxed pursuant to the terms of Real Property Tax Law § 566 (1). The statute refers to "the owner of the dam, reservoir or dam site *and* appurtenant rights" (Real Property Tax Law § 566 [1]; emphasis supplied). As discussed above, petitioner's ownership is limited to the severed riparian right to use 15 feet of "head". The dam, reservoir and dam site belong to the District and/or the State. Accordingly, while petitioner has an ownership interest in the riparian right to use the flowage from the dam, it is not also the owner of the dam, reservoir or dam site, as required by the statute.

Nor can petitioner's ownership of the power house, which uses the flowage from the dam, render it an owner whose interest in the flowage is taxable pursuant to the statute. It is clear from the record that the power house is separate and distinct from the dam, reservoir or dam site. For example, the agreements between the District and petitioner recognize that the site for the dam was conveyed to the District by petitioner; the District has the obligation to operate and maintain the dam, while operation and maintenance of the power house are petitioner's obligation; and the power house is located below the dam, on separate land owned by petitioner. The Legislature has also recognized the

distinction between a power house and the dam and reservoir, including each in the definition of "project" for water power purposes (ECL 15-1703 [6]). It is also significant that control over the flow from the dam is vested exclusively in the discretion of the District, and petitioner's use of the flowage is subject to this discretion. We conclude, therefore, that Real Property Tax Law § 566 does not provide specific statutory authorization for the challenged tax assessment.

Having concluded that no authority exists in the Real Property Tax Law for respondents' assessments of petitioner's "water rights", we see no reason to pass upon petitioner's claims that the Real Property Tax Law has been "preempted" by ECL 15-2115 and that the assessments are void by reason of respondents' reliance upon advice of the SBEA. Judgment should be granted to petitioner canceling the challenged assessments.

KANE, J. P., MAIN, YESAWICH, JR., and LEVINE, JJ., concur.

Order reversed, on the law, without costs, motion granted and it is declared that respondents' 1982 and 1983 assessments on petitioner's "water rights" were illegal and duplicative.