*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0059P (6th Cir.)
File Name: 01a0059p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

SANDUSKY MALL COMPANY,
        *Petitioner/*
*Cross-Respondent,*

    *v.*

NATIONAL LABOR RELATIONS
BOARD,
        *Respondent/*
*Cross-Petitioner,*

NORTHEAST OHIO DISTRICT
COUNCIL OF THE UNITED
BROTHERHOOD OF
CARPENTERS AND JOINERS OF
AMERICA, AFL-CIO,
        *Intervenor.*

Nos. 99-6400/6596

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board.
No. 8-CA-25097.

Argued: December 1, 2000

Decided and Filed: March 5, 2001

1

Before:  WELLFORD, SILER, and BATCHELDER,
Circuit Judges.

_____

## COUNSEL

**ARGUED:** David A. Fantauzzi, Youngstown, Ohio, for Petitioner.  David A. Fleischer, NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., for Respondent.  Stephen A. Markus, ULMER & BERNE, Cleveland, Ohio, for Intervenor. **ON BRIEF:** David A. Fantauzzi, Youngstown, Ohio, for Petitioner.  David A. Fleischer, NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., for Respondent. Stephen A. Markus, Eric M. Schreibman, ULMER & BERNE, Cleveland, Ohio, for Intervenor.

WELLFORD, J., delivered the opinion of the court, in which SILER, J., joined.  BATCHELDER, J. (p. 19), delivered a separate concurring opinion.

━━━━━━━━━━━━━

## OPINION

━━━━━━━━━━━━━

HARRY W. WELLFORD, Circuit Judge.  Before this court is an appeal from a decision by a divided National Labor Relations Board ("NLRB") involving handbilling by union members in the mall, owned and operated by Sandusky Mall Company ("Sandusky").

Sandusky is a private, limited partnership that owns and operates Sandusky Mall ("mall"), an enclosed mall in Sandusky, Ohio.  The mall contains ninety-six stores and a central concourse, which provides access to the stores, and within the concourse are places to sit and also space leased for booths.  The mall manager is responsible for enforcing Sandusky's policy against handbilling and solicitation of mall

_____

## CONCURRENCE

_____

ALICE M. BATCHELDER, Circuit Judge, concurring.  I concur in the majority opinion.  I write separately to highlight what, in my view, is the crucial issue in this case, namely, what level of deference this court should afford the NLRB when it interprets Supreme Court precedent.  In order to accept the Board's arguments, one must first accept the premise that *Holly Farms* governs that issue.  This is not the case.  *Holly Farms* speaks only to the level of deference due to the Board's interpretation of the NLRA; it does not address the deference due to the Board's interpretation of judicially created exceptions.  Accordingly, we review the NLRB's interpretation of the *Babcock* exception de novo.

In *Cleveland Real Estate Partners*, this circuit squarely addressed the question of whether the *Babcock* discrimination exception requires an employer to suffer non-employee union trespassers on its property if that employer allows other organizations occasional access.  On facts nearly identical to those presented here, we plainly rejected the argument put forth by the Board and held that "the term 'discrimination' as used in *Babcock* means favoring one union over another, or allowing employer-related information while barring similar union-related information." *Cleveland Real Estate Partners*, 95 F.3d at 464.  An employer's granting charitable or merchant groups access to the mall pursuant to its policy while barring union protesters simply does not qualify as discrimination under *Babcock*.

Accordingly, I concur with the conclusion that this court should be guided by our decision in *Cleveland Real Estate Partners*, but emphasize that *Holly Farms* is simply inapplicable to any case that involves interpretation of court decisions.

of Supreme Court and Sixth Circuit decisions de novo. We do not defer to the Board with respect to the interpretation of judicial precedent. We do, however, give deference in matters of statutory construction of the NLRA by the Board so long as its interpretation of the statute is reasonable. The Board has expressly noted that the inaccessibility exception is not applicable here. However, to the extent that the Board's brief may be read to argue to the contrary, we note that the union has failed to show that it cannot otherwise get its message across, and we therefore reject the Board's argument that nonemployee union organizations may handbill to public consumers concerning a mall tenant's contracting with a non-union construction company.

*Cleveland Real Estate Partners* is controlling precedential authority, but if it were not, we would adhere to Sandusky's rationale that the union has demonstrated no handbilling right under the circumstances here. Even if the discrimination exception were relevant in this case, we would not construe it in this case, as urged by the Board, because the conduct of the nonemployee union handbillers is not similar conduct to that of civil and charitable organizations who obtained permission from Sandusky to use the mall in a limited way deemed beneficial.

Most of the case authority cited by the Board, in our view, is irrelevant, only peripherally related to the issue in this case, or is generally supportive of Sandusky's argument. We conclude that the Board's interpretation of the law under the stipulated facts is not reasonable nor is it persuasive.

This case does not involve organizational rights; it does not involve employee picketing or handbilling, and if Sandusky is deemed to be an employer, it has not encouraged or allowed handbilling by persons similarly situated to the union organizers in this case.

Accordingly, we decline to enforce the order of the Board and we **REVERSE** its determination.

customers.[1] Responsible for the good will and successful marketing of the mall, the manager decides whether to lease space for temporary displays. Permission for temporary use is granted in writing and may be gratis, as directed by the mall manager.

The mall driveways, however, are posted with signs which read "soliciting and posting of bills prohibited." One of those signs is on the driveway in front of the Sears store at one end of the mall, and the Attivo location, now in controversy, is near Sears and its mall entrance. The mall entrance was posted with "no soliciting" signs.

In November, 1991, intervenor Northeast Ohio District Council of Carpenters, United Brotherhood of Carpenters & Joiners of America, AFL-CIO ("union") learned that a mall tenant, Attivo, hired a non-union construction contractor, R. E. Crawford Construction Co. ("Crawford"), to renovate its store. In November and December, the union distributed handbills urging mall customers not to patronize Attivo because of its hiring of a non-union contractor, which the union contended had undermined local wage standards.[2] The union handbillers were not employees of Sandusky, Attivo, or Crawford. The union also threatened to handbill another mall tenant, OfficeMax, to protest its hiring of a non-union contractor. Sandusky's attorney notified the union's representative on November 12, 1992, that any handbillers on mall property would be considered trespassers and would not be permitted to hand out such handbills. On December 3,

---

[1] Sandusky maintains a policy "not to permit any soliciting (except occupants strictly in accordance with their prior written agreement with the Shopping Center), handbilling, leafleting, picketing, or patrolling (collectively called 'solicitation') by any persons on the privately owned property of the Shopping Center. . . . All Persons engaging in such solicitation will be asked to leave the Shopping Center property and, if they refuse, may be arrested for criminal trespass."

[2] The handbill asked the "general public" not to patronize Attivo "because they are undermining construction wage and benefit standards in this area by employing Crawford."

1992, the union again handbilled inside the mall near Attivo's entrance, and a mall security guard told the handbillers they were not permitted to handbill on the mall property and must leave. The handbillers left but returned the next day, and Montevideo, the mall manager, again asked them to leave and delivered a letter from Sandusky's attorney. The union handbillers left shortly but returned on December 16, 1992, and refused to leave at the security guard's request. When the mall manager called the Perkins Township police and the handbillers refused to obey the police's orders, they were arrested for trespass under Ohio Rev. Code § 2911.21.

The union then promptly filed an unfair labor practice charge against Sandusky, and on January 29, 1993, the NLRB's General Counsel issued, and later amended, a complaint alleging that Sandusky had violated § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1). The parties agreed to waive a hearing before an administrative law judge ("ALJ") and transfer the case to the Board itself for a decision on stipulated facts. The Board accepted the stipulated record and motion to transfer the case to the Board for decision. Nearly four years later, the Board found that Sandusky violated the Act and issued its decision. Sandusky filed a timely petition for review, and the Board filed a cross-application for enforcement. This court granted the union's motion to intervene in this controversy.

In addition to filing the complaint on January 29, 1993, the Regional Director of the NLRB notified Sandusky by letter to cease the trespass prosecution against union representatives within seven days. Very promptly Sandusky informed the Regional Director and the clerk of the court in which the prosecution was pending that it would not take any further action in the trespass prosecution unless this case were resolved in its favor. Later, the local court dismissed both trespass charges against the union representatives and, at their request, sealed the record without opposition by Sandusky.

The specific issue before this court is whether Sandusky may be compelled to permit non-employee union members to

even more 'peripheral.'" 39 F.3d at 683. The union's activity in the instant case relates to a peripheral right only and deserves less protection under the Act. In *Great Scot*, the activity was directed toward the target employer and its wage standards; in this case, the handbilling is even more remote--it is directed at a contractor doing business with a tenant of the alleged "employer" Sandusky.

We also note that *Sparks Nugget, Inc. v. NLRB*, 968 F.2d 991 (9th Cir. 1992), cited in the Board's brief, does not support the discrimination exception urged by the Board. The Board noted, in fact, that *Sparks Nugget* found no discrimination despite the fact that "the employer itself had distributed anti-union handbills."

The Board also cites, in its attenuated argument in its brief dealing with the discrimination exception, *Davis Supermarkets, Inc. v. NLRB* 2 F.3d 1162, 1177 (D.C. Cir. 1996), which involved employees seeking to participate in *comparable* activities and decided that the employer discriminated by denying one union access while *granting another union access*.[7] Even more distinguishable is *United Parcel Serv., Inc. v. NLRB*, 228 F.3d 772 (6th Cir. 2000), which decided the rights of *employees* distributing union literature to other *employees* in a non-work area to solicit their membership in the union.

The Board asks us to ignore or to overrule *Cleveland Real Estate Partners*, but our firm, fixed rule is that one panel of the court cannot overrule a prior precedential holding. *E.g., United States v. Smith*, 73 F.3d 1414, 1418 (6th Cir. 1996). The Board has failed to produce Supreme Court precedent that mandates such action. As we did in *Cleveland Real Estate Partners*, this court reviews the Board's interpretation

---

[7] Nor do we find *Restaurant Corp. of America v. NLRB*, 827 F.2d 799 (D.C. Cir. 1987), to be of any comfort to the Board. *Restaurant Corp.* simply held that one single isolated contact at lunch by a pro-union employee could not be the subject of discharge based on a no-solicitation rule.

## IV.  *THE BOARD AND UNION ARGUMENT*

In sum, the Board argues in its brief that *Cleveland Real Estate Partners* "is no longer controlling authority." Why? Because *Cleveland Real Estate Partners* "applied an improper standard of review"; that is, it did not accept as controlling the Board's interpretation of Supreme Court (and Sixth Circuit) precedent on the so-called "discrimination exception." The Board proceeded to devote much of its brief to its interpretation of Supreme Court precedent on the issues, particularly *Babcock & Wilcox* and *Lechmere*, arguing first that "[t]he fact that union representatives acting on behalf of the employees whose wages and benefits were threatened, rather than the employees themselves, were seeking to distribute handbills here should not affect the outcome."

In its brief arguing the meaning of judicial decisions dealing with the issues before us, the Board cites *O'Neil's Markets v. United Food & Commercial Workers' Union, Meatcutters Local 88, AFL-CIO, CLC*, 95 F.3d 733 (8th Cir. 1996). Among other things, *O'Neil's* had much to say about *Babcock & Wilcox* and *Lechmere*, but it had nothing to say about the "discrimination exception." *O'Neil's Market* did not enforce the Board's order but remanded to place properly the burden on the union and to determine the extent of the validity of the area standards claim as well as defining the employer's property rights to the area involved. The Board is simply mistaken by implying in its brief that *O'Neil's Market* had anything to do with the discrimination exception. As to area standards picketing or handbilling, *O'Neil's Markets* finds it protected conduct under certain circumstances, but like *NLRB v. Great Scot, Inc.*, 39 F.3d 678, 684 (6th Cir. 1994), the Board and the union carry "the burden of proof regarding the validity of the area standards message." 95 F.3d at 738.

The Board acknowledges in its brief, moreover, that *Great Scot* holds that nonemployee area-standards picketing warrants even less protection than nonemployee organizational activity under Section 7 because it is "a right

trespass on the mall's property for the purpose of distributing handbills urging mall customers not to patronize non-union employers.  This issue is a difficult one, but it is not one of first impression.  We addressed precisely that issue in *Cleveland Real Estate Partners v. NLRB*, 95 F.3d 457 (6th Cir. 1996).  The sharp divide among members of the Board in the case before us today indicates the Board's difficulty with this issue.

## I.  *EFFECT OF CLEVELAND REAL ESTATE PARTNERS*

We are normally bound by the precedent established by a decision on a particular issue by a prior panel of our court. The Board majority, at best, inferentially acknowledged its burden to persuade us to deny the efficacy of *Cleveland Real Estate Partners* by stating:

We are mindful that the United States Court of Appeals for the Sixth Circuit, in which this case arises, has rejected the Board's interpretation of "discrimination" as used in *Babcock & Wilcox*.[3] In *Cleveland Real Estate Partners*, the Board adopted the administrative law judge's finding that the employer discriminatorily prohibited nonemployee union representatives from distributing handbills directed at shoppers to discourage them from patronizing a nonunion retailer in the mall because it permitted nonlabor related handbilling and solicitations by others in the mall.  The Sixth Circuit denied enforcement of the Board's order, holding that, post-*Lechmere*,[4] "discrimination" as used in *Babcock & Wilcox*, "means favoring one union over another, or allowing employer-related information while barring similar union-related information."  We respectfully disagree with the Sixth

---

[3] *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105 (1956).

[4] *Lechmere, Inc. v. NLRB*, 502 U.S. 527 (1992).

Circuit's conclusion and adhere to our view that an employer that denies a union access while regularly allowing nonunion organizations to solicit and distribute on its property unlawfully discriminates against union solicitation.

*Sandusky Mall Co.* , 329 N.L.R.B. No. 62 (Sept. 30, 1999) (footnotes and citations omitted).

The discrimination to which the Board refers is the so-called "discrimination exception" to the general rule as explained by the Supreme Court in *NLRB v. Babcock & Wilcox*, 351 U.S. 105, 112 (1956):

[A]n employer may validly post his property against nonemployee distribution of union literature if reasonable efforts by the union through other available channels of communication will enable it to reach the employees with its message, and if the employer's notice or order does not discriminate against the union by allowing other distribution."

In *Cleveland Real Estate Partners* we rejected the Board's contention about the meaning of this exception, stating:

The Board's understanding of *Babcock*'s discrimination principle is well-exemplified by *Be-Lo Stores*, 318 N.L.R.B. No. 1 (1995), where the Board held that the occasional presence of "Muslims selling oils and incense," "an 'occasional' Jehovah's Witness distribut[ing] the Watchtower magazine," and "on one occasion a local Lions Club solicit[ation]," demonstrated discriminatory enforcement of a no-solicitation rule when the employer denied access to a union. *Accord Dow Jones & Co.*, 318 N.L.R.B. No. 59 (1995). We think the Board has misinterpreted *Babcock*.

*Babcock* and its progeny, which weigh heavily in favor of private property rights, indicate that the Court could not have meant to give the word "discrimination" the import the Board has chosen to give it. To discriminate

*Perry Education Ass'n v. Perry Local Educators Ass'n*, 460 U.S. 37 (1983), and *Lloyd Corp. v. Tanner*, 407 U.S. 551, 564 (1972). We agree also with dissenter Brame's "directions" to the Board.

[T]he Board must ask what is the nature of the conduct for which access is sought and what effect would this type of conduct reasonably be expected to have? Certainly, employers must be able to make distinctions based on the time, place, and means of solicitation to the extent that mall business may be negatively affected by one and not another. For example, outside solicitors from an organization sitting quietly at a table in a remote section of the mall would likely have a far different impact than if they were distributing handbills while roaming the common areas or picketing within the mall.

### III. *EFFECT OF HOLLY FARMS*

*Holly Farms Corp. v. NLRB*, 517 U.S. 392 (1996), involved a technical and definitional issue about whether a poultry corporation was a "farming operation" under the NLRA. The Supreme Court affirmed the Fourth Circuit's deference to the Board under the circumstances of that case because it found "the Board's answer [interpretation] reasonable." *Id.* at 403. The Court added that under the circumstances, the Board's construction did not have to be "the *best* way to read the statute." *Id.* at 409. Four dissenters felt that the Board seriously misconstrued the statute and that its interpretation was unreasonable. Contrary to the intimation of the Board, we do not read *Holly Farms* as overruling the essential tenets of *Cleveland Real Estate Partners*. What is involved in the instant cases, and in *Cleveland Real Estate Partners*, is not the construction of an ambiguous term in the NLRA; rather it is the Board's interpretation of Supreme Court precedent on the specific question of union nonemployee solicitation in a shopping mall, contrary to the mall's established rules and without the mall's permission.

activity conflicts with the business of a mall tenant and whether the activity concerns or would generate controversy.

Under its policy, the Respondent admittedly permitted a variety of charitable, civic, and even commercial organizations to enter the mall for solicitation, displays, and presentations.

In sum, the Board dissent also stated its interpretation of relevant Supreme Court precedent on the issue before it, including particularly *Lechmere*:

While acknowledging that nonemployee union agents nonetheless have some, albeit, extremely limited rights to solicit on private property, the Court faulted the Board for "failing to make the critical distinction between the organizing activities of employees (to whom Section 7 guarantees the right of self organization) and nonemployees (to whom Section 7 applies only derivatively)." The Court then explained that presumptively an employer cannot be compelled to allow distribution of literature by nonemployee organizers on his property while noting that the presumption might be rebutted if, consistent with the Court's earlier decision in *Babcock and Wilcox, supra,* the employees are otherwise inaccessible. The *Lechmere* Court stressed that "*Babcock*'s rule is a narrow one. It does not apply whenever non trespassory access to employees may be cumbersome or less-than-ideally effective. . . ." In reversing the Board's holding, the Supreme Court also rejected the Board's application of its decision in *Jean Country* . . . .

(Footnotes omitted). Finally, as did this court in *Cleveland Real Estate Partners*, dissenter Brame insisted, we believe correctly, that alleged "discriminatory" conduct in allowing solicitation on handbilling required that "discrimination be among comparable groups or activities," and that the activities themselves under *consideration* must be "*comparable*." In support of his opinion, this dissenter cited

in the enforcement of a no-solicitation policy cannot mean that an employer commits an unfair labor practice if it allows the Girl Scouts to sell cookies, but is shielded from the effect of the Act if it prohibits them from doing so. *Cf. Guardian Indus. Corp. v. NLRB*, 49 F.3d 317, 320-22 (7th Cir. 1965). Although the Court has never clarified the meaning of the term, and we have found no published court of appeals cases addressing the significance of "discrimination" in this context, we hold that the term "discrimination" as used in *Babcock* means favoring one union over another, or allowing employer-related information while barring similar union-related information.

Although we are respectful of the Board's interpretation, we are not compelled to follow it when it rests on erroneous legal foundations. *See Lechmere*, 502 U.S. at 539, 112 S.Ct. at 849.

*Cleveland Real Estate Partners*, 95 F.3d at 464-65.

The *Be-Lo Stores* NLRB decision, above referred to and involving this same issue, was reversed by the Fourth Circuit at 126 F.3d 268 (4th Cir. 1997). The Board majority acknowledged in n. 7 of its opinion in this case that:

[T]he Fourth Circuit found that the few solicitations that occurred at the employer's over 30 stores in the past year and a half were only "isolated and sporadic" and did not establish disparate enforcement of the employer's no-solicitation policy. In dicta, the court noted its "doubt" that, post-*Lechmere*, the *Babcock & Wilcox* discrimination treatment exception applies to nonemployees who do not propose to engage in organizational activities and that an employer's approval of limited charitable or civic distribution while excluding union distribution constitutes discrimination.

In addition to *Cleveland Real Estate Partners* and *Be-Low Stores*, the Board majority in this case acknowledges that in *Guardian Indus. Corp. v. NLRB*, 49 F.3d 317 (7th Cir. 1995):

[T]he Seventh Circuit held that an employer had not unlawfully discriminated against union solicitation where the employer allowed only "swap and shop" notices to be posted on its bulletin board and refused to allow the posting of notice of union meetings as inconsistent with its policy. The court found that the Board had failed to establish in what sense it might be discriminatory to distinguish between for-sale notes and meeting announcements.

The facts in *Cleveland Real Estate Partners* are very similar to those in the instant controversy. Union handbillers campaigned in a private mall against a mall shop owner for employing nonunion workers. The handbillers were instructed to leave because of the mall no-solicitation rule. The mall owner threatened police action if the non-employee union handbillers did not desist. The union filed unfair labor practice charges against the mall and the Board sustained the charges. We described the underlying NLRB decision in *Cleveland Real Estate Partners*:

> The NLRB held that the handbilling in this case was "protected activity" under section 7 of the Act and that by excluding the handbilling by union representatives, but permitting solicitation and handbilling if various kinds by others such as the Girl Scouts, the Knights of Columbus, political candidates, and school children selling candy, the mall owner, through its managing agent, unlawfully discriminated against the union within the meaning of the rule announced in *N.L.R.B. v. Babcock*, 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975.

95 F.3d at 462. We held in the appeal from the Board's decision that "we review the Board's factual application and statutory construction under a substantial evidence standard, a deference that is warranted if the Board's conclusions are based upon a reasonably defensible construction of the Act." *Id.* (citing *Emery Realty, Inc. v. NLRB*, 863 F.2d 1259, 1263 (6th Cir. 1988)).

if it is not legally sound. *See Webcor*, 118 F.3d at 123 n.8 (distinguishing between interpretation of the NLRA and interpretation of decisional precedent, saying "[t]his is also not an instance in which the Board has departed from the Supreme Court's interpretation of the statute." (Citing *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 130-31)).

We deem the views expressed by the dissenters to the Board's decision, including reliance upon *Cleveland Real Estate Partners*, to be persuasive. We agree particularly with the following assessment by dissenting Board member Brame of the Board's interpretation of the "discrimination exception" to the general rule permitting a mall owner to exclude nonemployee union handbillers.

> [T]he parameters of the Board's application of the so-called "discrimination exception" first articulated in *NLRB v. Babcock & Wilcox* are so vague that the Board too must resort to subjective, "I know it when I see it" criteria to decide whether its requirements have been met, thus leaving employers without fair notice of what they may lawfully do.

329 N.L.R.B. No. 62 (Brame, dissenting) (footnote omitted). This dissenter also noted that Sandusky's no-solicitation rule was issued "[i]n response to the Supreme Court's decision in *Lechmere*." *Id.* at n.2. The dissenter also pointed out how this policy was carried out:

> Under this policy, the Respondent requires that organizations seeking access to the mall obtain permission and sign a temporary display agreement. The Respondent approves organizations which, in its business judgment, enhance the public image of the mall and provide service to the community. In considering applications for access, the Respondent also looks to whether the Respondent is likely to receive an economic benefit, such as rent, "good will," or increased customer traffic, whether the activity is consistent with the commercial retail purpose of the mall, whether the

of the narrow *Babcock & Wilcox* exception. *Sandusky Mall Co.*, 329 N.L.R.B. No. 62 (Sept. 30, 1999). The Board argued that its earlier seemingly inconsistent ruling in *Farm Fresh, Inc.*, 326 NLRB No. 81 (1998), relied upon by the dissenters, was distinguishable. The Board conceded in n.11 that *Lloyd Corp. v. Tanner*, 497 U.S. 551 (1972), settled the question that a union had no *First Amendment* right to use a privately owned shopping center premises for handbilling and other union purposes in the face of a general non-solicitation ban.

The Board's decision cites *Riesbeck Food Markets v. NLRB*, 315 NLRB 940 (1994), as supportive of its view that an employer's "reviewing and evaluating" requests to solicit on its property by choosing between those deemed beneficial and those detrimental to the employer's business was discriminatory conduct. *Riesbeck*, however, the Board conceded, was reversed by the Fourth Circuit at 91 F.3d 132 (4th Cir. 1996). A Board dissenter accordingly found *Riesbeck* to be consistent with his position.

On the question of the deference due the Board's decision and interpretation of the statute, the Board cited *NLRB v. Webcor Packaging, Inc.*, 118 F.3d 1115 (6th Cir. 1997). We note that *Webcor* does not involve the basic underlying issues in this case and in *Lechmere*; rather, it dealt with the statutory definition of a labor organization. *Webcor* includes a separate opinion, and the majority simply held that the "Board's definition is not unreasonable," and thus its decision on that question was enforceable. 118 F.3d at 1123-24. *Webcor* also observed in a footnote that "the Supreme Court has recently repeated its holding that we must accept the Board's reasonable construction of ambiguous terms in the NLRA under *Chevron*." *Id.* at 1123 n.8 (with reference therein also to the very recent case of *Holly Farms Corp. v. NLRB*, 517 U.S. 392 (1996)). We see nothing in *Webcor* that limits the essential holding in *Cleveland Real Estate Partners* in any way. The *Webcor* footnote addressed the level of deference a reviewing court must afford the Board in construing ambiguous terms of the NLRA. *Webcor* supports the proposition that we owe no deference to the Board's holding

*Cleveland Real Estate Partners* reversed the Board after analyzing *Babcock* and *Lechmere, Inc. v. NLRB*, 502 U.S. 527 (1992), which also involved a controversy with respect to an organizational campaign by a union against a retail store in a shopping plaza owned by Lechmere. Non-employee union organizers began a handbilling campaign and Lechmere, in accordance with its policy, prohibited this non-employee union activity. The Board held Lechmere guilty of unfair labor practice violations under § 8(a)(1) and a divided panel of the First Circuit affirmed the Board decision.[5]

*Cleveland Real Estate Partners* interpreted *Lechmere* "in light of the Supreme Court's earlier decision in *Babcock*."

After reviewing its holding in *Babcock*, the Supreme Court stated:

> *Babcock*'s teaching is straightforward: § 7 simply does not protect nonemployee union organizers *except* in the rare case where "the inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the usual channels[.]" . . . Where reasonable alternative means of access exist, § 7's guarantees do not authorize trespasses by

---

[5] *Lechmere, Inc. v. NLRB*, 914 F.2d 313 (1st Cir. 1990). Among other things, the First Circuit gave "considerable deference to [the] views" of the Board "in administering the Act," 914 F.2d at 317, so long as these views were "founded upon substantial evidence and legally sound." As long as the Board's construction of the Act was "sensible" in light of "High Court precedent," the First Circuit majority adhered to the Board's decision. *Id.* at 321. Along with a D.C. Circuit decision and *Emery Realty*, 863 F.2d 1259 (6th Cir. 1988), also construed by this court in *Cleveland Real Estate Partners*, the First Circuit majority cited *Babcock* in support of its decision, but it did not refer to the so-called "discrimination exception." There was a vigorous dissent in *Lechmere* stating, among other things, that a recent Board decision relied upon by the majority, *Jean Country*, 291 N.L.R.B. No. 4 (1988), was just "another of the Board's periodic attempts to expand *Babcock & Wilcox*, all of which have, in the past, received little encouragement from the courts." 914 F.2d at 330.

nonemployee organizers, even . . . "under . . . reasonable regulations" established by the Board.

> *Lechmere*, 502 U.S. at 537, 112 S.Ct. at 847-48 (quoting *Babcock*, 351 U.S. at 112, 76 S.Ct. at 684).

95 F.3d at 463. The Supreme Court in *Lechmere* reversed the First Circuit and declined to follow the Board precedent in *Jean Country*, stating the general rule in this type of shopping center handbilling:

> "While *Babcock* indicates that an employer may not always bar nonemployee union organizers from his property, his right to do so remains the general Rule. To gain access, *the union has the burden of showing that no other reasonable means of communicating its organizational message to the employees exists* or that the employer's access rules discriminate against union solicitation. That the burden imposed on the union is a heavy one is evidenced by the fact that the balance struck by the Board and the courts under the *Babcock* accommodation principle has rarely been in favor of trespassory organizational activity."

*Lechmere*, 502 U.S. at 535 (quoting *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U. S. 180, 205 (1978)) (emphasis in original; footnotes omitted).

*Lechmere* concluded that "we judge an agency's later interpretation of the statute against our prior determination of the statute's meaning." 502 U.S. at 537. The *Lechmere* court also noted a "distinction 'of substance' between the union activities of employees and nonemployees." *Id.* (citing *Babcock & Wilcox*, 351 U.S. at 113). In the latter situation, "the Board was not permitted to engage in the same balancing" between an owner's right to exclude from a shopping center and an employee's right to engage in union activity. *Id.* In sum, *Lechmere* re-emphasized *Babcock*'s rule that "'an employer may validly post his property against

nonemployee distribution of union literature.'"[6]  *Id.* at 538 (quoting *Babcock & Wilcox*, 351 U.S. at 112).

*Cleveland Real Estate Partners*, relying on *Lechmere*, cited the principles above set out. It also relied upon *United Food & Commercial Workers AFL-CIO, Local No. 880 v. NLRB*, 74 F.3d 292, 297-99 (D.C. Cir. 1996). It was not "discrimination" with the meaning of *Babcock & Wilcox* for Cleveland Real Estate Partners to enforce its general no-solicitation rule against the union nonemployees and at the same time occasionally to allow limited charitable activities in the mall deemed beneficial to the owner and the tenants.

> An owner of private commercial property who permits a charitable organization to distribute information or conduct solicitations on its property simply does not implicate the policies of the NLRA and does not, without more, render an employee guilty of an unfair labor practice when later it chooses to follow the general rule of "validly post[ing its] property against nonemployee distribution of union literature." *Babcock*, 351 U.S. at 112, 76 S.Ct. at 684.

95 F.3d at 465.

## II.  *THE BOARD DECISION*

Confronted with the firm policy of this court in *Cleveland Real Estate Partners*, supported by other circuit courts as well, the Board concluded in the instant case that "the solicitation by various organizations is sufficient proof of disparate treatment" or "discrimination" within the meaning

---

[6] *Lechmere* noted that the Court gauges and weighs an agency determination of a statute against its own prior interpretation: "Once we have determined a statute's clear meaning, we adhere to that determination under the doctrine of *stare decisis*, and we judge an agency's later interpretation of the statute against our prior determination of the statute's meaning." *Lechmere*, 502 U.S. at 536, 537, quoting *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 131 (1990) (internal quotations omitted).